# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

TOMMY D. SEEVER,          )
                              )
                              )
          Plaintiff,          )
                              )
v.                           )       No.  04-CV-632-SAJ
                              )
JO ANNE B. BARNHART,       )
Commissioner of Social Security    )
Administration,             )
                              )
          Defendant.       )

## OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2]  Plaintiff asserts that the Commissioner erred because (1) the ALJ erred, as a matter of law, by ignoring vital and probative evidence; and (2) the ALJ failed to include all of Plaintiff's mental restrictions in Plaintiff's RFC.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on January 27, 1956.  [R. at 72].  Plaintiff completed a disability report on June 24, 2002.  [R. at 81].  Plaintiff indicated that Plaintiff was prevented from working due to the residual effects of back surgery and psychological overlay including

---

[1]   This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2]   Administrative Law Judge Stephan Calvarese (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated February 26, 2004. [R. at 10 - 20A].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on June 17, 2004.  [R. at 5].

clinical depression.  [R. at 82].  Plaintiff noted that he stopped working on June 14, 1999 because he could no longer tolerate work.  [R. at 82].

Plaintiff completed the Disability Supplemental Interview Outline form on June 16, 2002.  Plaintiff noted that on an average day he woke at 6:00 a.m. and did the exercises assigned by his physical therapist.  According to Plaintiff, completing those exercises takes one hour.  [R. at 103].  Plaintiff goes to his parents to drink coffee and visit with them for two to three hours.  Plaintiff checks on a trailer house that he owns and sweeps the floor or waters the yard as necessary.  Plaintiff noted he spends the majority of the day visiting or sitting.  [R. at 103].  Plaintiff usually eats only one meal in the evening which is prepared by his girlfriend.  [R. at 103].  Plaintiff watches television or drives in the evening, and goes to sleep around 10:30 p.m.  [R. at 103].  Plaintiff sleeps seven to eight hours each night and wakes for about one hour each night due to pain.  [R. at 103].

Plaintiff indicated that he believes he gets along well with others generally, but that sometimes he does not want to be around anyone.  [R. at 103].  Plaintiff is able to clean his house and launder his clothes.  [R. at 104].  Plaintiff shops for groceries and household supplies.  [R. at 104].  Plaintiff noted that he fishes three or four times over the summer.

Plaintiff completed a pain questionnaire on July 16, 2002. [R. at 107].  Plaintiff noted that his pain is in his neck, shoulders, middle back, right elbow, hands, lower back, right hip, and left foot.  [R. at 107].  Plaintiff noted that he was taking Lortab for pain.  [R. at 108].

An MRI of Plaintiff's lumbar spine dated April 27, 1999, indicated a disc protrusion at the L3-4 level, and a right paracentral disc protrusion at the L4-5 level.  [R. at 127].  Plaintiff was admitted June 21, 1999 and discharged June 22, 1999.  The examiner noted

that Plaintiff was carrying a pipe in August 1998 when a coworker dropped it and the whiplash effect produced neck pain which did not improve with conservative treatment. Plaintiff was taken to surgery and underwent a decompression at both levels.  Plaintiff had a fair amount of neck pain and spasms at time of discharge.  [R. at 130].  An MRI indicated disk herniations at 5-6 and 6-7 on his left side.  [R. at 131].

Plaintiff was examined on August 5, 1999.  [R. at 167].  Plaintiff complained of back pain radiating down his right leg with occasional right testicular pain associated with the back pain.  [R. at 167].  Plaintiff was injured one year prior when he hurt his neck and back.  [R. at 167].  Plaintiff had a posterior cervical fusion but still stated that he had pain in his back radiating down his right leg.  An MRI indicated a herniated disk at L3-4 and L4-5.  Plaintiff was sent to the pain clinic for a single lumbar epidural injection.  [R. at 167]. Plaintiff was 5'10" and weighed 190 pounds.  [R. at 167].  The examiner noted that Plaintiff tolerated the procedure with no problems.  [R. at 168-69].

Records dated September 3, 1999, indicated that Plaintiff had well-healed neck incisions, a slight restriction of neck motion, and a full range-of-motion in his back with pain on straight leg raising on the right.  [R. at 182].  The doctor noted that Plaintiff would be admitted for surgery.  [R. at 183].  On September 10, 1999, Plaintiff had a right L4-5 hemilaminectomy and excision of a herniated disk.  [R. at 176].

Plaintiff had an electromyogram on October 28, 1999.  [R. at 221].  The tester noted that there was evidence of recent partial denervation in the right hypothenar with fibrillation potentials present.  In addition, the right biceps had some evidence of old denervation. There was also some evidence of slowing of the right ulnar nerve across the wrist.  [R. at 222].

-- 3 --

Plaintiff had an initial evaluation by Mark Hayes, M.D. on January 25, 2000. [R. at 339]. He noted that Plaintiff had continued back and neck pain. He recommended a myelogram and a CT scan to insure no additional pathology contributed to Plaintiff's pain. [R. at 341].

Plaintiff was evaluated by Neurosurgery Specialists on February 1, 2000. [R. at 225]. Benjamin Benner, M.D., wrote a letter summarizing Plaintiff's visits and ratings on February 1, 2000. [R. at 225]. Plaintiff was first seen on April 27, 1999 with complaints of an on-the-job injury in August of 1998. Initial impression was that Plaintiff had cervical lumbar radiculopathy. Conservative measures were attempted, but Plaintiff did not improve. [R. at 225]. Plaintiff's first surgery was a decompressive cervical laminectomy on June 21, 1999. [R. at 225]. Plaintiff had a lumbar laminectomy on June 21, 1999. [R. at 225]. Plaintiff was last seen on February 1, 2000. Plaintiff could, in the lumbar region, flex 60 degrees, extend 10 degrees, and tilt 15 degrees bilaterally. Straight leg raising was negative. Calves were symmetrical. Plaintiff had a diminished right knee jerk. Cervical region had 20 degrees of extension, 20 degrees of flexion, 15 degrees of tilt, and 45 degrees of rotation bilaterally. Plaintiff's reflexes were symmetrical. Plaintiff had, in the cervical region, 10% postoperative status combined with 2% for two levels combined with 60% of a loss of range of motion for a combined rating of 33%. In the lumbar area, Plaintiff had a 20% evaluation. Plaintiff was given a final rating of 46%. "The patient is felt to be employable at light physical demand levels. . . . based on my experience and observation, would feel that the light physical demand levels which would involve maximum lifting of 20 pounds and not working continuously overhead, would be most appropriate use of his

talents.  As a carpenter, this would relate him to either doing finishing work or working in a cabinet shop or performing supervisory capacity."  [R. at 226].

Discharge records dated February 22, 2001 indicate Plaintiff was admitted February 21, 2001 and discharged February 22, 2001 for surgery.  Plaintiff had an anterior cervical corpectomy at C6 and an anterior cervical instrumentation at C5 through C7 with anterior cervical fusion.  [R. at 245].

Plaintiff was initially evaluated by Gerald R. Hale, D.O., on July 13, 2001.  Plaintiff complained of lower back pain, right hip and right leg pain in addition to intermittent left leg pain.  [R. at 253].  Plaintiff stated that he could not sit or stand for more than 20 minutes without severe back pain.  Plaintiff used no cane or assistance for walking.  Plaintiff had a prior cervical laminectomy in 1999 and a spleen removed in 1977.  [R. at 253].  Plaintiff underwent a three-level lumbar discogram.  [R. at 253].  The discogram was interpreted as unremarkable at the L2/3 level; severe degenerative disc disease was seen at the L3/4 level; severe degenerative disc disease was seen at the L4/5 level with small disc protrusions and a tiny right paracentral and lateral disc herniation.  [R. at 257].

On August 20, 2001, Plaintiff reported taking four to six Lortab tablets daily for pain.  [R. at 273].  Plaintiff had surgery on August 22, 2001.  Plaintiff underwent a total decompressive laminectomy at L3-4 and a bilateral discectomy at L3-4.  [R. at 258].

On September 20, 2001, Plaintiff reported continued pain.  X-rays on September 18, 2001 showed good position of the interbody graft.  The doctor noted that with negative straight leg raising and four pain pills per day, he believed Plaintiff was on the road to recovery.  [R. at 275].

Plaintiff was initially examined by James A. Rodgers, M.D., on September 19, 2000. [R. at 283].  Plaintiff had been injured when carrying a large piece of pipe when the other employee dropped his end causing Plaintiff instant pain in his neck and back.  [R. at 283]. Conservative measures were not helpful.  In June 1999, Plaintiff had a posterior cervical hemilaminectomy by Dr. Benner.  Plaintiff had improvement in his left shoulder and left arm pain, and on October 9, 1999 had a lumbar heimilamnectomy and discectomy.  [R. at 283]. Plaintiff had improvement after the surgeries, but continued to have difficulty in his neck, back, arms and legs and did not return to employment.  [R. at 284].  Plaintiff complained of alternating pains in his legs; problems with forward flexion; lack of regular bowel movements; numbness in his right leg; radiating pain from his back through his hips; walking increased Plaintiff's pain.  Exercises for his back seemed to help.  Plaintiff noted that he did not believe he could work as a carpenter or fitter and did not believe he could do activities that required extended neck or lifting away from the body or lifting greater than 35 - 50 pounds.  [R. at 284].  Examination of upper extremities revealed no definite weakness.  Some sensory loss in D2 of Plaintiff's right hand was noted.  Plaintiff's left triceps jerk was diminished compared to the right.  Plaintiff had a full range of motion of his shoulders, elbows, and wrists.  [R. at 285].  Neck extension was limited to 25 degrees; forward flexion limited to 30 degrees; rotation full to 60 degrees.  [R. at 285].  Plaintiff's motor, sensory and reflex examination of the lower extremities revealed no weakness. Seated straight leg raising caused some back pain.  Plaintiff' stance was erect.  [R. at 285]. The doctor concluded that he believed Plaintiff had significant discogenic pain from the C5-6 and C6-7 levels.  The roots were decompressed posteriorly on the left at C5-6 and C6-7. The doctor noted that "at present time he cannot return to gainful employment in any

position that requires bending, stooping and lifting, and that he will have to be retrained for more sedentary type duties with or without surgery."  [R. at 286].

Plaintiff was examined by James A. Rodgers, M.D., on February 4, 2002.  [R. at 268].  Plaintiff had surgery on February 21, 2001.  [R. at 281, 287].  Plaintiff had a microdiscectomy and fusion of C5-6 and C6-7 with anterior instrumentation between C5 and C7.  [R. at 281].  Three weeks after his surgery, on March 15, 2001, Plaintiff noted that he believed he was doing better than prior to surgery, and was taking less Lortab and Flexeril.  Plaintiff still complained of some pain between his shoulder blades.  [R. at 280].  On May 10, 2001, Plaintiff was three months postop and the fusion between the C5 and C7 was viewed as nicely healed.  Plaintiff complained of increasing back, right hip, and leg pain.  [R. at 279].  Plaintiff had good strength in his upper extremities.  [R. at 279].  Plaintiff returned five months after surgery (in August of the prior year).  Plaintiff stated that the prior surgery helped him with his constant low back pain.  Plaintiff reported some pain in his right leg, and sometimes experienced flu-like sensations where he ached all over his body.  [R. at 268].  Plaintiff took Celex 20 mg each day which helped to improve his mood.  [R. at 268].  Straight leg raising caused more pain on the right side than on the left; Plaintiff's legs appeared strong.  Plaintiff was looking forward to the removal of instrumentation from his back.  [R. at 268].  The doctor released him from his care.  [R. at 268].  The doctor noted that he believed he was temporarily totally disabled until the time of the removal of the instrumentation in his back, and then for four to eight weeks after removal.  [R. at 268].  On December 20, 2001, Dr. Rodgers noted that Plaintiff did have a limitation of his range of motion of his neck and thoracolumbar spine.  [R. at 270].

On November 10, 2000, Plaintiff contacted Mark Hayes, M.D. and was very upset. Plaintiff explained that he could no longer tolerate his symptoms, and that the pain and delay was causing serious emotional distress.  Plaintiff's original injury was in June 1998 and Plaintiff was frustrated and in pain since that time.  [R. at 332].

On a visit on June 28, 2001, Plaintiff reported that the pain made him non-functional. Plaintiffs's wife reported that Plaintiff could not drive even short distances.  [R. at 323].  On July 27, 2001, Plaintiff was seen in a follow-up evaluation by Dr. Hayes.  He noted that Plaintiff wanted to proceed with operative treatment.  The doctor noted that additional surgery should be considered only for intractable and unbearable pain. [R. at 321].  Plaintiff was told that at best, his permanent restrictions would be 40 pounds, and he might have to seek vocational retraining.  [R. at 321].  On September 18, 2001, Plaintiff was reportedly doing fine with no significant leg pain.  The doctor noted that he would get Plaintiff started in physical therapy.  [R. at 320].  On October 16, 2001, Plaintiff's doctor noted that Plaintiff was doing well and therapy had helped him.  [R. at 319].  Plaintiff had no tenderness over his back, just some aching pain in his legs and thigh.  [R. at 319].  On January 31, 2002, Plaintiff reported soreness and discomfort in his back.  Plaintiff had tenderness over the hardware.  Radiographs indicated the fusion looked satisfactory.  The doctor noted he was pleased with Plaintiff's progress, but believed that the hardware needed to be removed. [R. at 313].

In March 5, 2002, Plaintiff's doctor, Mark A. Hayes, M.D., reported that the hardware removal surgery had gone well and Plaintiff was doing well.  He noted that he would release Plaintiff to return to work in three weeks.  [R. at 312].  On April 2, 2002, Plaintiff was reported to be doing very well.  Plaintiff had previously had his hardware removed, and was

ready to be released to return to work.  Plaintiff planned to begin working as a carpenter. [R. at 310].  Plaintiff still had some pain, and was given one prescription of Lortabs with no refills.  [R. at 310].

Richard A. Hastings, D.O., performed an outpatient evaluation of Plaintiff's records on April 21, 2002 for the purpose of a workers' compensation claim.  [R. at 288].  The doctor noted that he reviewed all of Plaintiff's records, and that Plaintiff was released as of April 4, 2002.   Post-operatively, Plaintiff indicated that he was self-employed as a carpenter, but had difficulty performing carpentry work due to severe pain involving his neck, upper extremities, low back pain, and leg pain, and was only able to tolerate these duties three hours, three days per week.  [R. at 292].  The doctor noted Plaintiff's range of motions.  [R. at 294].  The doctor also noted that Plaintiff had a psychological overlay and clinical depression as a result of his on-the-job injury.  [R. at 297].  The doctor concluded that Plaintiff had sustained a 47% permanent impairment to the person.  [R. at 289].  The doctor additionally noted that, in his medical opinion, and given that Plaintiff was 46 years old with a tenth grade education and a work history of solely heavy manual labor, that Plaintiff was 100% permanently totally disabled and economically unemployable.  [R. at 300].

A Psychiatric Review Technique form was completed by C.M. Kampschaefer, Psy.D. on September 25, 2002.  [R. at 343].  The doctor noted that Plaintiff's impairment was not severe.  [R. at 343].  Plaintiff was reported having a mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episode of decompensation.  [R. at 353]. The consultant noted that Plaintiff's activities of daily living included physical therapy,

light housework, light yard work, shopping, and Plaintiff additionally visited others for three to four hours each day.  [R. at 355].

A Residual Physical Functional Capacity Assessment was completed December 24, 2002, by Dr. Woodcock.  [R. at 357].  He noted that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds; stand or walk six hours in an eight hour day and sit six hours in an eight hour day.  The doctor noted that Plaintiff assisted with laundry, light housework, and shopping.  [R. at 358].  Plaintiff was limited to occasionally stooping. [R. at 360].

Plaintiff was examined by John W. Hickman, Ph.D., on October 1, 2003.  [R. at 368]. Plaintiff exhibited a stiff posture and a short gait.  Plaintiff reported taking Lortab twice each day.  [R. at 368].  Plaintiff's speech was clear, fluent, and spontaneous; his thought processes were relevant, coherent, and goal-directed.  [R. at 368].  The examiner administered various tests to Plaintiff.  The examiner noted that Plaintiff was not evidencing any cognitive deficits but was reporting a severe degree of anxiety and depression.  He noted that he would not expect much change in Plaintiff's functioning in the near future. Plaintiff's stress from his surgeries and resulting pain were reported to have taxed his psychological coping abilities but not yet disrupting his cognitive functioning.  [R. at 372]. The examiner completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  Plaintiff had slight restrictions on remembering and carrying out detailed instructions, and no restrictions on short/simple instructions.  [R. at 374].  Plaintiff had slight restrictions on interacting with the public and supervisors and responding to changes in routing, and moderate restrictions in interacting with co-workers and responding to work pressures.  [R. at 375].

-- 10 --

Plaintiff was examined by E. Joseph Sutton II, D.O. on October 22, 2003.  [R. at 376].  Plaintiff reported that he had continual pain and no improvement with any surgeries and that none of his doctors had told him anything.  [R. at 376].  Plaintiff had experienced two neck surgeries and two back surgeries.  [R. at 376].  Plaintiff reported driving, doing some housework, and yard work.  Plaintiff "runs the vacuum and does some mopping."  [R. at 377].  Plaintiff reported spending quite a bit of time on his 50 acre farm, but reported that he could not ride his tractor, and that his wife has to feed the cows.  [R. at 377].  Plaintiff's straight leg raising test was normal in both sitting and supine positions.  [R. at 378].  Plaintiff was in and out of a chair and up and down a step stool and examination table without difficulty.  [R. at 378].  Plaintiff's gait was normal.  Heel walking and toe walking was normal.  Plaintiff had a decreased range of motion in the cervical spine, but no reported pain with it.  [R. at 378].  The doctor concluded that lifting and carrying were affected and Plaintiff should lift only 50 pounds occasionally and 25 pounds frequently.  Standing and walking were limited to six hours in an eight hour day.  Plaintiff had no restrictions regarding manipulative functions.  Plaintiff had a normal ability to push and pull.  [R. at 378].  The doctor concluded that Plaintiff had an essentially normal examination except for a minor restriction in the range of motion of his neck and wrist.  [R. at 379].  The doctor noted the Plaintiff's range-of-motions.  [R. at 380-82].  The doctor additionally completed an Ability to do Work-Related Activities (Physical) form.  [R. at 385-88].

Plaintiff testified at a hearing before the ALJ on January 13, 2004.  [R. at 398].  Plaintiff was 47 years old at the time of his hearing before the ALJ.  Plaintiff completed ninth grade in high school.  [R. at 403].  Plaintiff did not obtain a GED.

Plaintiff stopped working in June of 1999 due to pain in his lower back, neck, shoulders, and hip.  [R. at 403].  Plaintiff reported that he had five prior surgeries.  [R. at 404].  Plaintiff was released by Dr. Hayes to return to work on April 2002.  Plaintiff believes that he was released with a 25 pound weight lifting restriction.  [R. at 404].  Plaintiff's current doctor is Dr. Gibson.  [R. at 404].

At the time of the hearing, Plaintiff was not receiving any mental health treatment. [R. at 405].  Plaintiff stated that he could not afford it.  Plaintiff was asked if he had checked on any free clinics in Oklahoma, and answered that no, he had not.  [R. at 405].

Plaintiff noted that he had completed his physical therapy which assisted him in being able to move.  [R. at 406].  Plaintiff takes Lortabs to help reduce the pain.  According to Plaintiff, the effect of the Lortabs lasts for approximately three hours, and Plaintiff takes two each day.  [R. at 406].

Plaintiff sleeps approximately eight hours each night.  [R. at 406].  According to Plaintiff he is up in the middle of the night two or three times, and often rests during the day for thirty minutes to one hour.  [R. at 407].  Plaintiff also soaks in hot baths to relieve his pain.  [R. at 507].

Plaintiff stated that his most severe pain is in his upper back, his arms, shoulders, neck, and between his shoulder blades.  [R. at 408].  According to Plaintiff, he also experiences numbness in his hands and his thighs.  [R. at 408].

Plaintiff stated that on a normal day he wakes at 6:00 a.m. and visits with his wife and daughter, who is six years old, and assists in getting her ready for school.  [R. at 409]. Plaintiff sometimes soaks in the tub and then does his exercises which take about one hour.  [R. at 409].  Plaintiff sits and watches a movie.  Plaintiff does his chores which

include feeding two horses and eleven cows. [R. at 409]. Plaintiff stated that it takes about 30 minutes if he hurries, but it usually takes him about two hours. [R. at 410]. Plaintiff sometimes rides the lawn mower for about thirty minutes, but does no raking. [R. at 410]. Plaintiff vacuums and does the dishes. [R. at 410]. Plaintiff visits with family approximately three times each week. [R. at 411].

Plaintiff believes that the heaviest weight that he could lift without hurting himself is 25 pounds. [R. at 412]. Plaintiff could lift that weight about three times in a day. [R. at 412]. Plaintiff could lift ten pounds on a more frequent basis. [R. at 413]. Plaintiff believes he would be uncomfortable standing after 30 minutes. Plaintiff can walk one mile, but the exertion would tire him. [R. at 413]. Plaintiff sometimes misses the plot of a television show that he is watching. [R. at 414]. Plaintiff stated that when he writes his hands sometimes cramp and shake. [R. at 414]. Plaintiff previously worked as a carpenter. [R. at 416].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*.  *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

---

[3/]    Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).  Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521.  If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.  A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.   *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).   The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ noted that Dr. Benjamin Benner, in February 2000 opined that Plaintiff was employable at "light physical levels" with a 46% whole man impairment.  [R. at 15].  Dr. Rodgers released Plaintiff from his care on February 11, 2002, noting that he thought that all that could be done had been done.  [R. at 16].  Dr. Hayes in April 2002 observed that Plaintiff was doing "really well" and was ready to be released to return to work.  [R. at 16]. Plaintiff was examined by E. Joseph Sutton, II, D.O. on September 16, 2003.  Plaintiff reported that he was able to drive, do some house work, and some yard work, was able to vacuum and spend time on his 50 acre farm.  [R. at 17].  Plaintiff had normal ranges of

---

[4/]    Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

motion of the neck and wrist.  Heel/toe walking was normal.  Dr. Sutton concluded Plaintiff should be able to occasionally lift 50 pounds and frequently lift 25 pounds.  [R. at 17].

The ALJ noted that J. Gibson, D.O.,  found that Plaintiff should be able to complete tasks with supervision on July 18, 2002.  [R. at 16].  The ALJ discussed John W. Hickman's examination on October 1, 2003.  [R. at 16].  The ALJ noted that Plaintiff's IQ score was 98; the ALJ noted the WRAT-3 was at the 7th grade level.  Plaintiff was oriented to time, place and person and his attention span and concentration was intact.  [R. at 16].  Plaintiff's Beck Scale scores indicated severe anxiety and depression.   Plaintiff's MMPI-2 profile indicated he was presenting himself in a negative light and was overreporting his difficulties.  [R. at 16].  Plaintiff was assigned a GAF score of 55 and had a pain disorder with medical and psychological factors, depression disorder with irritation, and anxiety disorder.  [R. at 16].

The ALJ concluded that Plaintiff had a spinal impairment.  The ALJ noted that Plaintiff's treating surgeon stated Plaintiff would need to live with his current level of residual pain and that the claimant had reported to the consultative examiner that he received no pain relief from surgeries although post-operative notes indicated improvement.  The ALJ noted that none of Plaintiff's surgeons, treating physicians, or consultative examiners indicated that Plaintiff is completely unable to work.  [R. at 18].  The ALJ observed that Plaintiff performs housework, yard work, cares for two horses and feeds the horses.  The ALJ concluded that Plaintiff's allegations of being unable to work were not supported by the medical records and Plaintiff's activity level.

The ALJ concluded that Plaintiff could perform a wide range of medium work.  The ALJ determined Plaintiff should be limited to only occasional climbing, balancing, kneeling,

crouching, crawling, or stooping.  The ALJ additionally determined that Plaintiff should be limited to performing tasks where there is no direct contact with co-workers.  [R. at 18]. The ALJ additionally noted that Plaintiff had been released from the care of his surgeons; that Plaintiff had essentially normal clinical findings; and that Plaintiff can drive, perform numerous daily activities.  The ALJ additionally noted that Plaintiff has no evidence of participation in counseling; no inpatient hospitalization, and no psychotropic medications. [R. at 18].  Based on the testimony of a vocational expert, the ALJ found that Plaintiff could perform work in the national economy.  [R. at 19-20].

## IV.  REVIEW

**ALJ IGNORED EVIDENCE**

Plaintiff initially asserts that the ALJ erred by ignoring significant probative evidence. First, Plaintiff focuses on Dr. Hickman's findings.  Plaintiff acknowledges that the ALJ discussed the findings by Dr. Hickman.  However, Plaintiff claims that the ALJ failed to reference Dr. Hickman's findings in his Mental Medical Source Statement that Plaintiff had moderate difficulties in certain categories.  Plaintiff additionally refers to several detailed specifics in the exams given by Dr. Hickman and claims that the ALJ failed to adequately address the specifics within Dr. Hickman's report.

The ALJ specifically summarized Dr. Hickman's consultative report and referred to many of the specific tests that Plaintiff asserts the ALJ did not properly consider.  Dr. Hickman found that the stress from Plaintiff's surgeries had taxed Plaintiff's coping abilities but had not yet disrupted Plaintiff's cognitive functioning.  [R. at 372].  Dr. Hickman completed a Medical Source Statement and found that Plaintiff had only slight restrictions in remembering detailed instructions and a moderate restriction in interacting appropriately

with co-workers and in responding to work pressures.  Moderate is defined as "there is moderate limitation in this area but the individual is still able to function satisfactorily."  The restriction is defined as permitting the individual to retain the ability to satisfactorily function. [R. at 374].  In his limitations, the ALJ found that Plaintiff should be limited to performing tasks where there is no direct contact with co-workers.   The ALJ also discussed the GAF score of 55 with the vocational expert but was not given any specific conclusions.  Plaintiff does not explain how the ALJ's finding with respect to Plaintiff's RFC fails to adequately include any limitations placed on Plaintiff based upon Dr. Hickman's evaluation.

Plaintiff additionally asserts that the ALJ failed to discuss Dr. Hasting's impairment evaluation of Plaintiff in April 2002.  Plaintiff already recognizes that an ALJ is not required to discuss every piece of evidence.  Plaintiff suggests that the ALJ failed by not discussing all significant and probative evidence, and that Dr. Hasting's evaluation qualifies as significant and probative.  The Court disagrees.

Dr. Hastings did an outpatient evaluation of Plaintiff for the purpose of a workers' compensation claim.  [R. at 288].  Dr. Hastings concluded that Plaintiff had sustained a 47% permanent impairment to the person.  [R. at 289].  The impairment given by Dr. Hastings is consistent with the other medical record of evidence and does not otherwise stand out in Plaintiff's medical record.

Dr. Hastings did additionally noted that, "in his medical opinion," and because Plaintiff was 46 years old with a tenth grade education and a work history of solely heavy manual labor, that, in his opinion, Plaintiff was 100% permanently totally disabled and economically unemployable.  [R. at 300].  This opinion, however, is not a medical opinion, but is the vocational conclusion of a medical doctor based upon Plaintiff's impairments, his

work history, his prior performance of only heavy work, and his educational background. The ultimate conclusion regarding whether or not a Plaintiff is disabled is left to the ALJ. The Court will not conclude that the ALJ erred by failing to consider the vocational conclusion of a medical doctor that an individual was not "employable."

**MENTAL RFC NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

Plaintiff asserts that the substantial evidence in this case indicated that Plaintiff has more than mild mental deficits.  Plaintiff notes that Plaintiff placed one phone call to Dr. Hayes when Plaintiff was "in tears."  Plaintiff observes that two doctors placed him on anti-depressants.  Plaintiff notes Dr. Hickman's psychological examination and conclusions.

The majority of Dr. Hickman's findings and conclusions have been discussed, above. In addressing Plaintiff's asserted mental impairment, the ALJ also noted that Plaintiff had been released from the care of his surgeons; that Plaintiff had essentially normal clinical findings; that Plaintiff can drive, perform numerous daily activities; that Plaintiff had no evidence of participation in counseling; no inpatient hospitalization, and no psychotropic medications. [R. at 18].  In addition, Plaintiff testified that he had not sought out any free medical care or treatment for his asserted depression.  The ALJ also discussed Dr. Hickman's report and conclusions.  The Court concludes that the mental RFC is supported by substantial evidence in the record.

Dated this 23rd day of September 2005.

Sam A. Joyner
United States Magistrate Judge